**FILED**

**May 29, 2026**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

_____

No. 24-16

_____

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

JAMES DEE MCKINNEY AKA 1227,
Defendant Below, Petitioner.

_____

Appeal from the Circuit Court of Harrison County
The Honorable Thomas A. Bedell, Judge
Case No. CC-17-2023-F-36

AFFIRMED

_____

Submitted: April 1, 2026
Filed: May 29, 2026

Addison O. Tonkery, Esq.
STEPTOE & JOHNSON PLLC
Bridgeport, West Virginia
Counsel for Petitioner

John B. McCuskey, Esq.
Attorney General
Michael R. Williams, Esq
Solicitor General
Mary Beth Niday, Esq.
Assistant Attorney General
Office of the Attorney General
Charleston, West Virginia

JUSTICE WOOTON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review." Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

2.      "A witness should give responsive answers to questions of counsel, and answers that are not responsive may be stricken on motion of the examining party especially if the unresponsive answer contains inadmissible evidence. Unresponsive answers, or those that are responsive but broader than the question, should not be viewed as the responsibility of the questioner." Syl. Pt. 4, in part, *State v. Crabtree*, 198 W. Va. 620, 482 S.E.2d 605 (1996).

3.      "The decision to declare a mistrial, discharge the jury, and order a new trial in a criminal case is a matter within the sound discretion of the trial court." Syl. Pt. 8, *State v. Davis*, 182 W. Va. 482, 388 S.E.2d 508 (1989).

4.      "The rights granted under Rule 615 of the West Virginia Rules of Evidence are not self-executing. In the absence of a specific request by the complaining

i

party, a defendant may not claim error as a result of the failure of the trial court to instruct witnesses as to the impact of a sequestration order." Syl. Pt. 5, *State v. Omechinski*, 196 W. Va. 41, 468 S.E.2d 173 (1996).

5.     "The Supreme Court of Appeals reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, in part, *State v. Lucas*, 201 W. Va. 271, 496 S.E.2d 221 (1997).

**WOOTON, Justice:**

The petitioner, James Dee McKinney aka 1227, appeals the December 11, 2023, order by the Circuit Court of Harrison County that sentenced him following a jury trial for two counts of robbery, one count of being a felon in possession of a firearm, and one count of presentment of a firearm during the commission of a felony. He argues that the circuit court improperly allowed the jury to hear testimony in violation of the Confrontation Clause, wrongfully denied his motion for a mistrial, and inadequately instructed the witnesses as to the court's sequestration order. Further, he claims that his sentence was excessive and disproportionate to his codefendants. After our review of the parties' briefs and oral arguments, the appendix record, and the pertinent legal authority, we find no error. We therefore affirm his convictions and resulting sentencing order.

## I. FACTS AND PROCEDURAL HISTORY

The petitioner was charged with committing two counts of robbery, one count of being a felon in possession of a firearm, and one count of presentment of a firearm during the commission of a felony, arising from a July 25, 2022 robbery.[1] In September 2023, at the beginning of the petitioner's jury trial for that robbery, the circuit court

---

[1] Additionally, the petitioner was charged with offenses arising from a different robbery that he allegedly committed on April 28, 2022. However, the jury acquitted the petitioner of those offenses.

discussed the sequestration of witnesses with counsel for the petitioner and the State. The court directed counsel "to instruct their witnesses to remain outside of the courtroom until called upon to testify, and further, not to discuss their testimony with anyone yet to testify."[2] The petitioner did not object to this procedure and there was no discussion from the parties about this direction from the court on the record.

Mr. Charlie Shaner, one of the victims in the July 2022 robbery, testified that a woman he knew knocked on the door of his home between 4:30 a.m. and 5:00 a.m. and said she did not have a place to go. When Mr. Shaner unlocked the door to let the woman in, the petitioner and two other men (Stoane Lockett and James Robinson) charged into his house and demanded drugs and money. According to Mr. Shaner, the petitioner had a black nine-millimeter Beretta firearm[3] that he "shoved [] in my wife's face" and told her shut up. The petitioner also pointed the firearm at Mr. Shaner's dog, which Mr. Shaner was holding, and pulled the trigger. When the firearm did not discharge, the petitioner ejected a nine-millimeter round, and he then chambered another round; Mr. Shaner said the police later retrieved the unspent round from beside his bed. Mr. Shaner said petitioner then yelled

---

[2] Although the judge indicated that the sequestration was by joint motion, the appendix record does not include any written motions nor a transcript from any pretrial hearings where this was discussed.

[3] Mr. Shaner testified that he recalled the make and manufacturer of the gun because he previously owned a similar gun. However, he testified that he sold the similar gun about two years before the July 2022 robbery and did not have nine-millimeter ammunition in his home at the time of the robbery.

"give him the s*** or he was going to kill us[.]" Mr. Shaner was able to flee, run to a neighbor's home, and ask the neighbor to call 9-1-1. When Mr. Shaner returned to his apartment, the petitioner and his codefendants had left, but Mr. Shaner found he was missing three cell phones, cash, and a PlayStation gaming system.

Mr. Lockett, one of the petitioner's codefendants,[4] testified that he and the petitioner planned and participated in the July 2022 robbery. Mr. Lockett recalled that after they entered Mr. Shaner's home, the petitioner displayed a black Beretta pistol and told Mr. Shaner he wanted "the money and dope."[5] When Mr. Shaner did not immediately comply, the petitioner "racked his gun" and ejected a bullet and then "rubbed the gun along [Ms. Woodson's] face." Mr. Lockett stated that he saw the petitioner take cell phones from the residence. Mr. Lockett spoke to the petitioner after the robbery and the petitioner told him that if anyone was arrested for the robbery they should "keep [their] mouths shut."

The State introduced other evidence of the petitioner's attempts at intimidation of witnesses throughout the trial. For instance, when Mr. Shaner was asked whether there had "been any attempts to influence your testimony in these proceedings[,]" he replied, "I've had a few people approach us that apparently knew [the petitioner] or

---

[4] Mr. Lockett pled guilty to aiding and abetting first-degree robbery and testified pursuant to a cooperation agreement.

[5] Mr. Lockett testified that they chose the residence because Mr. Shaner was a known drug dealer, a fact conceded by Mr. Shaner at trial.

some girls that he had dated and made statements wanting us to not testify and made threats." One man,[6] a codefendant of the petitioner in a different crime, specifically "approached [Mr. Shaner] about not testifying[]" while a female acquaintance of the petitioner "was making statements about us testifying and so forth."

During the trial, the State admitted several of the petitioner's phone calls, recorded by the jail, wherein the petitioner encouraged individuals outside the jail to intimidate or threaten witnesses. Throughout those calls the petitioner confidently suggested that the victims would not show up at trial. In a call with one female acquaintance he said that she should "let them know" not to appear at trial. In a call with a different female, after the petitioner repeatedly suggested that no adverse witnesses would testify against him, the female responded that she had intimidated a witness. In a jail call with a male the petitioner stated that "as long as these mother f***ers don't show up to court" then he would be good. Later in that same conversation the petitioner stated "[t]he only thing that could end up f***ing me up bro, the absolute only thing is them going to court yo. And [a female acquaintance] say [that] she [is] making sure that don't happen, so we'll see."

---

[6] The man, Joseph Burge, was arrested for participating in the April 28, 2022, robbery with the petitioner. Mr. Burge agreed to plead guilty and to testify against the petitioner regarding the April 2022 robbery. After relating testimony about how the petitioner had threatened other individuals, Mr. Burge testified that he too was intimidated by and scared of the petitioner.

Detective Cumberledge with the Harrison County Sheriff's Department investigated the July 2022 robbery and testified that he located an unfired nine-millimeter cartridge in a wastebasket near the bedroom nightstand at Mr. Shaner's residence. Detective Cumberledge testified that he listened to the petitioner's jail calls, testified that these calls linked the petitioner to the robbery, and also testified that the petitioner appeared to be seeking to intimidate others into not testifying in those jail calls.

Important to this appeal, during cross-examination petitioner's counsel asked Detective Cumberledge whether Mr. Shaner told him that he previously owned a nine-millimeter Beretta firearm. Because Detective Cumberledge could not recall discussing a gun with Mr. Shaner, petitioner's counsel provided the detective with a copy of his investigative report. Petitioner's counsel later gave the detective a transcript of a phone call between the detective and Ms. Woodson (Mr. Shaner's wife), who did not testify at trial, to see if the transcript refreshed his recollection. Petitioner's counsel instructed the detective to "[p]lease read [the transcript] quietly to yourself and see if that refreshes your recollection as to that particular conversation." The detective stated that the conversation was from "later on in his investigation." After the State objected that the question about the firearm had been asked and answered and counsel approached the bench for a sidebar, the detective asked, "Do you want me to continue reading?" Petitioner's counsel said,

5

"Yes, please. And just let us know when you're finished." Detective Cumberledge then testified,

> Okay. Yes. I refreshed my memory on this. I do vividly recall a phone conversation from August 9th, '22 where Sabrina Woodson had called in where she was trying to inform me that through an acquaintance of Charlie [Shaner]'s and Sabrina [Woodson]'s who are also acquaintances of [the petitioner] that they have been openly telling everybody that they planned to kill –

Petitioner's counsel interrupted Detective Cumberledge stating "Sir, my question was whether that refreshed your recollection[,]" and then asking the court if the parties could approach the bench. The parties approached the bench for a sidebar conference. At the sidebar, petitioner's counsel asked for a mistrial, stating that

> the question was whether that would refresh his recollection about this nine black millimeter Beretta [sic], not carte blanche to read something that would otherwise be inadmissible. I didn't ask him to read it out loud, I asked him to read it quietly to himself. I didn't ask for this answer, and, Your Honor, I think at this point this whole threatening to kill them, et cetera, I believe it's grounds for a mistrial.

The State responded that the detective's statement was cumulative evidence as

> the entirety of this trial has been premised on threats and intimidation of witnesses by [the petitioner] and people acting as his agents, testified to on the stand yesterday by Mr. Shaner who advised that he had received those threats, and the words of [the petitioner] himself from jail, and the words of Mr. Lockett, and the—I mean, one of the basic foundations of this whole trial. So I'm not sure how the detective mentioning something that has been part and parcel with every piece of evidence presented would constitute grounds for a mistrial.

6

The petitioner responded to the State's argument, "I believe that statement, these generalized acquaintances, that contains inadmissible evidence under hearsay, under the confrontation clause." In denying the petitioner's motion for a mistrial, the court suggested that the petitioner invited the response and further reasoned, "if that was the only reference in this case to the allegations of violence and threats and that, I think you may have [] more of a legal leg to stand on, but since that has been present throughout, it's not new information to this jury or anything[.]"

Testimony at trial showed that, when the petitioner was arrested, the petitioner originally offered a fake name but officers found court papers with the petitioner's name and another nine-millimeter cartridge. The West Virginia State Police Forensic Laboratory examined the unspent cartridges that were recovered from Mr. Shaner's home and during the petitioner's arrest. A forensic evaluator who testified at trial opined that, "the two loaded cartridges were cycled through the same firearm. So . . . the class characteristics and individual characteristics that [she] observed were in agreement enough to reach an identification conclusion." Notably, even the defense witness who conducted a comparison of the firearm cartridges conceded that the similarity of the markings on the cartridges is "compelling."

The petitioner testified in his own defense at trial, denying the charges in the indictment. Although he conceded that he was present during the July robbery, he claimed

7

that it was Mr. Lockett who took Mr. Shaner's possessions. According to the petitioner, he did not possess a firearm during the robbery, he knew he was prohibited from carrying a firearm, and claimed that he only carried a pellet gun because he was an avid fisherman and had been chased by wildlife. He also denied intimidating any witness or having others intimidate witnesses on his behalf, explaining that he believed that witnesses would not testify against him because of the "lifestyle" they were living: "like, everybody either on drugs or selling drugs and usually them people don't want to come to court[.]" On one jail call in which the petitioner is heard laughing in response to the female acquaintance saying that witnesses won't appear, he claimed that he laughed because that acquaintance is 5'3" and weighs 102 pounds and he understood her to be joking.

At the conclusion of the four-day trial, the jury convicted the petitioner of two counts of first-degree robbery, one count of being a felon in possession of a firearm, and one count of presentment of a firearm during the commission of a felony, all stemming from the July 2022 robbery.

The petitioner then filed a joint motion for a judgment of acquittal or for a new trial. Although that motion was not made a part of the appellate record, we glean from the transcript of a post-trial hearing that the petitioner argued that the State introduced inadmissible evidence at trial and that the circuit court erred in denying his request for a mistrial due to the State's introduction of inadmissible evidence. During oral argument on

the motion the petitioner identified the objectionable evidence as *Mr. Shaner's testimony*

that

> he had also heard that other people had been threatened, other threats have been made on behalf of the [the petitioner] or even by [the petitioner]. Certainly it was a vague statement at which point we asked to approach . . . . I do believe that would again constitute that type of prohibited testimony under the confrontation clause regardless of whether that would be admissible hearsay. Again, we have statements made by— allegedly made by other people to Mr. Shaner which would fall under that prohibition. Certainly, again as that bell can't be unrung, the jury heard that. I don't believe there would be any instruction that could have cured that at that point in time, Your Honor, hence our request for a mistrial at that point.

The petitioner argued that the evidence may have contributed to the jury verdict because it "could've bolstered the State's testimony as presented through the jail calls of [the petitioner]." The petitioner concluded that a hearsay analysis was not relevant and that the out-of-court statements violated the Confrontation Clause because they were testimonial. Conversely, the State responded that the jury verdict was supported by a "mountain of evidence . . . concerning [the petitioner's] attempts to intimidate and influence the testimony of witnesses, and a lot of it came from his own mouth, his own words."

Moreover, when the circuit judge informed the petitioner that it reviewed the trial transcript and did "not see a motion for mistrial with regards to Mr. Shaner's testimony" the petitioner conceded that the challenged testimony may have come in during Mr. Lockett's testimony or an entirely different witness. Notably, our review of the record

9

reflects that the petitioner did not object to any discussion of threats or intimidation during Mr. Shaner's testimony. Indeed, the transcript from the post-trial motion hearing reflects that the petitioner did not address Detective Cumberledge's testimony nor the questioning that prompted his earlier motion for a mistrial.

The circuit court stated that it was "not even sure again which witness we're talking about" but ultimately found

> that it was not testimonial, and two, that there's substantial evidence—I think [the prosecutor] used the word significant, but I think the proper word is substantial evidence—including the defendant's own testimony that would allow the admissibility of that evidence as we all seem to understand it at this point.

Accordingly, the court denied the petitioner's motion for judgment of acquittal/motion for a new trial.

At sentencing, the petitioner requested leniency, stating that he had a child and that "[o]ther people that w[ere] involved in the same case are out there with their kids and I'm the one facing life[.]" The circuit court addressed the petitioner's extensive criminal record in three different states, including several crimes of violence, which the court found reflected "a pattern and practice of the defendant." According to the court, the petitioner had seven misdemeanor convictions and "three, seven or eight, depending on how you count the prior felony convictions." Citing the petitioner's failure to pay prior

court costs, the court found that the petitioner "has not accepted responsibility or not lived up to his obligations in those matters." The court addressed the "capiases and the fugitives from justice and the obstruction and the prior drug related offense, which all add up to a very substantial criminal record that the [c]ourt has to consider in this matter." The court also noted that the petitioner showed no remorse and failed to accept responsibility for his actions in this case. Ultimately, the court sentenced the petitioner to terms of thirty years of imprisonment for each of the two first-degree robbery convictions, ten years of imprisonment for presentation of a firearm during the commission of a felony, and five years of imprisonment for possession of a firearm by a prohibited person, with the sentences for all four convictions to run consecutively to one another. He now appeals.

## II. STANDARD OF REVIEW

The petitioner's assignments of error are subject to particular standards of review, which will be set forth below. Nevertheless, our overarching standard is as follows:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000). With these standards in mind, we proceed to the parties' arguments.

11

### III.    DISCUSSION

The petitioner asserts four assignments of error: three of the assignments are alleged trial errors and one is related to his sentence. In his first two assignments of error, he argues that the circuit court erred when it allowed Detective Cumberledge to present the testimony of a witness who did not appear at trial. Recall that, at trial, the detective stated that Ms. Woodson said that acquaintances of the petitioner were saying that they planned to kill Ms. Woodson and Mr. Shaner. The petitioner asserts that this statement by the detective violated the Confrontation Clause in the United States and West Virginia Constitutions, and he also asserts that this testimony constituted inadmissible hearsay. In his third assignment of error, he argues that the court failed to appropriately sequester the witnesses at trial. Finally, he claims that his sentence is both excessive and disproportionate to his codefendants.

We begin with petitioner's assertion that his rights under the Confrontation Clause[7] were violated when Detective Cumberledge testified about the statement that he was given by an individual who did not testify at trial. The Confrontation Clause proscribes

---

[7] When we use the term "Confrontation Clause," we refer to rights guaranteed by both the federal and state Constitutions. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" Likewise, Section 14 of Article III of the West Virginia Constitution provides that, in criminal trials, "the accused shall . . . be confronted with the witnesses against him[.]"

the use of a "testimonial statement" by a witness who does not appear at trial. In Syllabus Point 6 of *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), this Court held:

> Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

The petitioner contends that Ms. Woodson's statements to the detective were testimonial and that he did not have an opportunity to cross-examine her. Thus, the petitioner asserts that the circuit court should have granted the petitioner's motion for a mistrial, or instructed the jury to disregard the detective's testimony.

The Confrontation Clause is generally implicated where the State seeks to introduce testimony against the defendant at trial. *See State v. Frazier*, 229 W. Va. 724, 728, 735 S.E.2d 727, 731 (2012) ("The Confrontation Clause prohibits the *prosecution* from introducing 'testimonial statements' of a witness who does not appear at trial." (emphasis added)); *State v. Dolen*, 252 W. Va. 465, 923 S.E.2d 395 (2025). Here, the State did not seek to introduce the challenged testimony, nor was the State even the examining party when the challenged testimony was elicited. Thus, there is no argument that "the Confrontation Clause [was] sacrificed by the State upon the altar of expediency to achieve a conviction[.]"*Mechling*, 219 W. Va. at 380, 633 S.E.2d at 325. Rather, the challenged statement made by Detective Cumberledge qualifies as an "unresponsive

13

answer." This Court has said, "[a] witness should give responsive answers to questions of counsel, and answers that are not responsive may be stricken on motion of the examining party especially if the unresponsive answer contains inadmissible evidence." Syl. Pt. 4, in part, *State v. Crabtree*, 198 W. Va. 620, 482 S.E.2d 605 (1996).

The petitioner did not move to strike the detective's unresponsive answer, and there is nothing showing the petitioner moved for the court to instruct the jury to disregard the testimony. The remedy sought by the petitioner was a mistrial. Hence, the issue for our consideration is whether the court improperly denied the petitioner's motion for a mistrial stemming from Detective Cumberledge's unelicited testimony.

"The decision to declare a mistrial, discharge the jury, and order a new trial in a criminal case is a matter within the sound discretion of the trial court." Syl. Pt. 8, *State v. Davis*, 182 W. Va. 482, 388 S.E.2d 508 (1989). Hence, "[t]he decision to grant or deny a motion for mistrial is reviewed under an abuse of discretion standard." *State v. Thomas*, 249 W. Va. 181, 187, 895 S.E.2d 36, 42 (2023) (quoting *State v. Lowery*, 222 W. Va. 284, 288, 664 S.E.2d 169, 173 (2008) (per curiam)).

"'[B]ecause mistrials are strong medicine . . ., it is only rarely—and in extremely compelling circumstances—that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision that the interests of justice do

14

not require aborting an ongoing trial.'" *State v. Taylor*, No. 21-0268, 2022 WL 1210533 at

*11 (W. Va. April 25, 2022) (quoting *United States v. Pierro*, 32 F.3d 611, 617 (1st Cir.

1994), *abrogated on other grounds by United States v. Anonymous Defendant*, 629 F.3d

68 (1st Cir. 2010)). A trial court should exercise its discretion to grant a mistrial only upon

a showing of "manifest necessity":

> The decision to declare a mistrial, discharge the jury and order
> a new trial in a criminal case is a matter within the sound
> discretion of the trial court. A trial court is empowered to
> exercise this discretion only when there is a "manifest
> necessity" for discharging the jury before it has rendered its
> verdict. This power of the trial court must be exercised wisely;
> absent the existence of manifest necessity, a trial court's
> discharge of the jury without rendering a verdict has the effect
> of an acquittal of the accused and gives rise to a plea of double
> jeopardy.

*State v. Williams*, 172 W. Va. 295, 304, 305 S.E.2d 251, 260 (1983) (citations omitted).

*See also* W. Va. Code § 62-3-7 (1923) ("[I]n any criminal case the court may discharge the

jury, when it appears . . . that there is manifest necessity for such discharge."). Further,

"[b]efore a manifest necessity exists which would warrant the declaring of a mistrial and

the discharging of the jury and ordering a new trial, the circumstances must be prejudicial,

or appear to be prejudicial, to the accused or the state." *Thomas*, 249 W. Va. at 183, 895

S.E.2d at 38, Syl. Pt. 8 (quoting Syl. Pt. 3, *State ex rel. Brooks v. Worrell*, 156 W. Va. 8,

190 S.E.2d 474 (1972)); *accord* Syl. Pt. 4, *State v. Dunn*, 237 W. Va. 155, 786 S.E.2d 174

(2016); Syl. Pt. 8, *Davis*, 182 W. Va. at 483, 388 S.E.2d at 509.

15

This Court has, on several occasions, noted that an unresponsive answer does not constitute prejudicial error if it is not dwelled upon by the prosecution, even if the answer implicates a constitutional right. For instance, in *State v. Herbert*, 234 W. Va. 576, 767 S.E.2d 471 (2014), the Court considered nonresponsive testimony from an officer that was elicited during the State's direct examination of the officer. The defendant refused to consent to gunshot residue testing after his arrest, forcing the arresting officers to obtain a search warrant. *Id.* at 589, 767 S.E.2d at 484. At trial, the officer testified that no gunshot residue was found on the defendant because three or four hours elapsed between the defendant's arrest and testing. The State asked whether that delay was ideal. *Id.* The witness responded, "Ultimately you would like to take them as quick as possible. *[The Defendant] was not cooperating with us at the time*." *Id.* The defendant moved to strike that testimony, arguing that it improperly referenced his constitutional right to not be searched without a warrant as well as his right to not give a statement, but the motion was denied. *Id.* On appeal, this Court found that the circuit court's decision did not amount to reversible error as "the officer's comment about the Defendant's lack of cooperation was unresponsive to the prosecutor's question, and it was never mentioned again during the trial, nor was it dwelled upon by the prosecutor." *Id.* The Court observed that it had previously held that "a brief, unresponsive answer not dwelled upon by the prosecution is not prejudicial error." *Id.* (*citing State v. Hillberry*, 233 W. Va. 27, 754 S.E.2d 603 (2014); *See also State v. Marple*, 197 W. Va. 47, 475 S.E.2d 47 (1996)).

In *Hillberry*, the defendant agreed to be interviewed by officers following his arrest, but the interview ceased after he requested a lawyer. 233 W. Va. at 30, 754 S.E.2d at 606. During the State's direct examination of an officer who participated in that interview, the State asked whether the defendant explained what happened to a pair of shoes that the perpetrator of the robbery was seen wearing. *Id.* at 34, 754 S.E.2d at 610. The officer responded, "When I asked him what happened to those shoes, he advised me that he did not wish to speak with me any further and that he would like to have a lawyer." *Id.* The defendant argued that the officer's testimony impermissibly referenced his constitutionally protected privilege against self-incrimination and presumption of innocence.[8] *Id.* The *Hillberry* Court, however, found that a "brief, unresponsive answer" did not amount to reversible error so long as "[t]he prosecutor did not make it an issue or bring up the subject again." *Id.*

We are directed to nothing in the record showing that the prosecutor made Detective Cumberledge's brief, unresponsive answer an issue, and nothing showing the statement was ever raised again. Also, as previously noted, the petitioner did not request that Detective Cumberledge's testimony be stricken or seek a curative instruction—he sought only a mistrial. If he wanted the unresponsive testimony to be stricken from the

---

[8] *See* Syl. Pt. 1, *State v. Boyd*, 160 W. Va. 234, 233 S.E.2d 710 (1977) ("Under the Due Process Clause of the West Virginia Constitution, Article III, Section 10, and the presumption of innocence embodied therein, and Article III, Section 5, relating to the right against self-incrimination, it is reversible error for the prosecutor to cross-examine a defendant in regard to his pre-trial silence or to comment on the same to the jury.").

17

record, the burden was on the petitioner to seek that remedy: "[A] witness should give responsive answers to questions, and answers that are not responsive may be stricken *on motion of the examining party* especially if the unresponsive answer contains inadmissible evidence." *Crabtree*, 198 W. Va. at 627, 482 S.E.2d at 612 (emphasis added).

Further, as the circuit court aptly noted, Detective Cumberledge was one of several witnesses who testified regarding the subject of threats and witness intimidation by the petitioner and his colleagues; indeed, the witness intimidation issue was presented, without objection, during the testimony of several witnesses including Mr. Burge and Mr. Shaner and during the presentation of the petitioner's jail calls. In summary, because witness intimidation was a central theme of the State's case at trial, the one unresponsive statement from Detective Cumberledge was not prejudicial to the petitioner and therefore no manifest necessity exists which would warrant a mistrial. Thus, we conclude that the circuit court did not abuse its discretion in denying the petitioner's motion for a mistrial.

Next, the petitioner argues that the court improperly handled the witness sequestration procedures at trial by placing the burden on the parties to direct their respective witnesses to not discuss their trial testimony with other witnesses. Rule 615 of the West Virginia Rules of Evidence provides, "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may

do so on its own." In Syllabus Point 4 of *State v. Omechinski*, 196 W. Va. 41, 468 S.E.2d 173 (1996), this Court discussed Rule 615 and held that:

> *when the Rule is invoked*, the witnesses should be directed clearly that they must all leave the courtroom . . . and that they are not to discuss the case or what their testimony has been or will be or what occurs in the courtroom with anyone other than counsel for either side.

(emphasis added). As emphasized in the preceding sentence "[t]he rights granted under Rule 615 . . . are not self-executing. In the absence of a specific request by the complaining party, a defendant may not claim error as a result of the failure of the trial court to instruct witnesses as to the impact of a sequestration order." *Id.* at 43, 468 S.E.2d at 175, Syl. Pt. 5, in part.

At the beginning of the petitioner's trial, in order to sequester the witnesses, the circuit court directed counsel for the parties to instruct their respective witnesses to remain outside until they were called to testify and to not discuss their testimony with anyone who has yet to testify. The petitioner did not object to this procedure, and he did not seek a specific instruction by the circuit court under Rule 615, but he now claims that the court's procedure was erroneous.

"To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect." Syl. Pt. 2, *State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 470 S.E.2d 162 (1996); *accord*

19

Syl. Pt. 10, *State v. Shrewsbury*, 213 W. Va. 327, 582 S.E.2d 774 (2003); Syl. Pt. 1, *State v. Sites*, 241 W. Va. 430, 825 S.E.2d 758 (2019). As we have explained, under this "raise or waive" rule, this Court will not consider non-jurisdictional issues raised for the first time on appeal because

> when an issue has not been raised below, the facts underlying that issue will not have been developed in such a way so that a disposition can be made on appeal. Moreover, we consider the element of fairness. When a case has proceeded to its ultimate resolution below, it is manifestly unfair for a party to raise new issues on appeal. Finally, there is also a need to have the issue refined, developed, and adjudicated by the trial court, so that we may have the benefit of its wisdom.

*Whitlow v. Bd. of Educ. of Kanawha Cnty.*, 190 W. Va. 223, 226, 438 S.E.2d 15, 18 (1993) (citations omitted). In *State v. LaRock*, 196 W. Va. 294, 316, 470 S.E.2d 613, 636 (1996), this Court explained that the raise or waive rule "prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result)."

By not objecting, the petitioner waived his right to argue that the circuit court violated Rule 615. Even if the petitioner did not waive this assignment of error, his argument as to this alleged error is premised on speculation—he speculates that it is "unclear whether the witnesses knew they were not permitted to discuss their testimony with one another[]" and that they "likely discussed the trial with one another." The

20

petitioner's argument amounts to nothing more than conjecture. He fails to direct this Court to any instance where the witnesses did not comply with the court's instruction to counsel. Thus, even if the petitioner has not waived this argument, we conclude that the petitioner has not met his burden and is entitled to no relief from this assignment of error.

Finally, the petitioner challenges his sentence. "The Supreme Court of Appeals reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, in part, *State v. Lucas*, 201 W. Va. 271, 496 S.E.2d 221 (1997).

The petitioner argues that his sentence was excessive and violated the constitutional proportionality principle. "Article III, Section 5 of the West Virginia Constitution, which contains the cruel and unusual punishment counterpart to the Eighth Amendment of the United States Constitution, has an express statement of the proportionality principle: 'Penalties shall be proportioned to the character and degree of the offence.'" Syl. Pt. 8, *State v. Vance*, 164 W. Va. 216, 262 S.E.2d 423 (1980). The petitioner contends that his sentence shocks the conscience, essentially arguing that his sentences ran afoul of the subjective proportionality test. *See State v. Patrick C.*, 243 W. Va. 258, 262, 843 S.E.2d 510, 514 (2020) ("The first [proportionality test] is subjective and asks whether the sentence for the particular crime shocks the conscience of the court and society." (quoting *State v. Cooper*, 172 W. Va. 266, 272, 304 S.E.2d 851, 857 (1983)).

Because this Court generally reviews proportionality only where "there is either no fixed maximum set by statute or where there is a life recidivist sentence[]" only the petitioner's robbery convictions[9] are subject to a proportionality analysis. Syl. Pt. 4, in part, *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981).

Although the subjective proportionality test requires consideration of "all of the circumstances surrounding *the offense*," the petitioner's argument does not focus on the circumstances surrounding the offense at all. *Patrick C.*, 243 W. Va. at 263, 843 S.E.2d at 515 (emphasis added) (quoting *State v. Adams*, 211 W. Va. 231, 233, 565 S.E.2d 353, 355 (2002)). Instead, the petitioner merely concludes that his sentence shocks the conscience. Because the petitioner does not argue that his thirty-year sentences for his robbery convictions are disproportionate in relation to the circumstances surrounding his commission of those crimes, he has not carried his burden of demonstrating that those sentences are disproportionate. Although the petitioner failed to carry his burden, because he raises a Constitutional challenge and the circumstances of his violent criminal behavior are apparent from the record, the Court concludes that his sentences do not shock the conscience where the evidence established that during the robbery he rubbed his gun along the female victim's face and also pulled the trigger of the gun while it was pointed at the victims' dog that was being held by the male victim.

---

[9] Petitioner was convicted of robbery under West Virginia Code section 61-2-12(a)(1) (2000), which provides that any person found guilty "shall be imprisoned in a state correctional facility not less than ten years."

The petitioner also argues that he received a disparate sentence from his codefendants. Although "disparate sentences of co-defendants that are similarly situated may be considered in evaluating whether a sentence is so grossly disproportionate to an offense that it violates our constitution," "[d]isparate sentences for co-defendants are not per se unconstitutional." *Cooper*, 172 W. Va. at 271, 304 S.E.2d at 856. Further, this Court has acknowledged that "[j]udicial discretion naturally leads to discrepancies in sentencing . . . 'Discretion, even if it ends in grossly unequal treatment according to culpability, does not entitle a guilty defendant to avoid a sentence appropriate to his own crime.'" *State ex rel. Appleby v. Recht*, 213 W. Va. 503, 519, 583 S.E.2d 800, 816 (2002) (quoting *Holman v. Page*, 95 F.3d 481, 486 (7th Cir. 1996)).

At sentencing, "[c]ourts consider many factors such as each codefendant's respective involvement in the criminal transaction (including who was the prime mover), prior records, rehabilitative potential (including post-arrest conduct, age and maturity), and lack of remorse. If codefendants are similarly situated, some courts will reverse on disparity of sentence alone." Syl. Pt. 2, in part, *State v. Buck*, 173 W. Va. 243, 314 S.E.2d 406 (1984). Notably, convictions for "separate and distinct" offenses means that the petitioner and his codefendants were not similarly situated. *See State v. Watkins*, 214 W. Va. 477, 481, 590 S.E.2d 670, 674 (2003) ("We believe that the appellant's claim of disparate sentencing is

23

untenable given the guilty pleas and subsequent convictions to two separate and distinct offenses by the appellant and the codefendant . . . .").

The petitioner asserts that his codefendants received more lenient sentences than what he received. In support of this argument he proffers that the female who was present during the July robbery was sentenced to not less than one nor more than five years for conspiracy to commit first-degree robbery, which was suspended, and she was placed on supervised probation for five years; that Mr. Lockett received a twenty-year sentence for aiding and abetting first-degree robbery, but his sentence was also suspended, and he was placed on supervised probation for five years; and that Mr. Robinson was sentenced to twenty-eight years for the first-degree robbery of Mr. Shaner, but he "did not receive a sentence for the second charge of first-degree robbery [of Ms. Woodson], possession of a firearm by a prohibited person, or presentation of a firearm during the commission of a felony." However, the petitioner fails to provide evidentiary support for these proffers. Additionally, he fails to provide information concerning his codefendants' prior criminal records, rehabilitation potential, and acceptance of responsibility, all of which would be necessary to evaluate any claimed disparity. The petitioner has not carried his burden of demonstrating error; accordingly we determine that the petitioner is entitled to no relief and therefore we decline to disturb the sentences imposed by the circuit court.

Finally, the petitioner argues that the circuit court considered impermissible factors at sentencing. This Court has acknowledged that "impermissible factors a court should not consider in sentencing include such matters as 'race, sex, national origin, creed, religion, and socioeconomic status[.]'" *See State v. Moles*, No. 18-0903, 2019 WL 5092415, *2 (W. Va. Oct. 11, 2019) (memorandum decision) (quoting *United States v. Onwuemene*, 933 F.2d 650, 651 (8th Cir. 1991)). The petitioner argues none of these factors. While the circuit court did acknowledge the petitioner's failure to accept responsibility at sentencing, "this Court has identified remorse or the lack thereof as a factor to be taken into account by a trial judge when sentencing a defendant." *State v. Jones*, 216 W. Va. 666, 669, 610 S.E.2d 1, 4 (2004); *see also id.* (discussing cases affirming sentences imposed following consideration of a defendant's failure to express remorse). Although the petitioner attempts to mischaracterize the court's recognition of his failure to express remorse or accept responsibility as a reflection on the petitioner's decision to exercise his right to trial, this argument is belied by the record. Contrary to the petitioner's argument, the court explicitly stated that it did not hold the petitioner's decision to go to trial against him:

> The [c]ourt would also note that in its opinion that there's been no acceptance of responsibility whatsoever in this matter. And that's not a comment that the defendant exercised his Constitutional Right to have a trial of 12 jurors in this court, but it's—the [c]ourt can consider, I mean, beginning with the contact with the Salem Police where he gave the wrong name. I mean, he—there's been no acceptance of responsibilities, and in the [c]ourt's opinion, no remorse for what his actions were even considering what he had to say today. The—on the acceptance of responsibility, I think the defendant's version in

25

the Presentence Report kind of laid it on—everybody was lying
I guess, that the victim said it was all about—or the defendant
said it was all about drugs. I went there to get drugs and things
didn't go that way.

Further, the petitioner argues that the court invaded the province of the jury by assessing the credibility of his testimony at sentencing. However, in *Jones* this Court observed that "a trial court may consider a defendant's false testimony at trial when determining his or her sentence." *Id.* at 670, 610 S.E.2d at 5; *see also* Syl. Pt. 2, *State v. Finley*, 177 W. Va. 554, 355 S.E.2d 47 (1987) ("A sentencing judge, in evaluating a defendant's potential for rehabilitation and in determining the defendant's sentence, may consider the defendant's false testimony observed during the trial."). In *Finley*, the Court recounted that "[i]t was within the trial judge's authority to determine whether the defendant's testimony contained willful and material falsehoods and if so, to assess, in light of all the other knowledge gained about the defendant, the meaning of that conduct with respect to his potential for rehabilitation." *Finley*, 177 W. Va. at 560, 355 S.E.2d at 53. Thus, the petitioner's argument that his credibility is a matter only for the jury was rejected by the *Finley* Court when it determined that it was within a court's authority to consider falsehoods by a defendant observed in determining rehabilitation potential at sentencing.

Applying our deferential abuse of discretion standard, because the petitioner's sentence was not based upon any impermissible factors and did not violate statutory or constitutional commands, we decline to disturb it on appeal. *See* Syl. Pt. 1,

26

*Lucas*, 201 W. Va. at 271, 496 S.E.2d at 221; Syl. Pt. 4, *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (1982).

## IV.  CONCLUSION

For the reasons stated above, we affirm the Circuit Court of Harrison County's December 11, 2023, order sentencing the petitioner for his convictions of two counts of robbery, one count of being a felon in possession of a firearm, and one count presentment of a firearm during the commission of a felony.

Affirmed.

27